## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

PAUL EMERY
ADC #109862                                                    PETITIONER


VS.                          5:06CV00293 JMM/JTR


RAY HOBBS, Director
Arkansas Department of Correction                             RESPONDENT


## <u>PROPOSED FINDINGS AND RECOMMENDED DISPOSITION</u>

## <u>INSTRUCTIONS</u>

The following recommended disposition has been sent to United States District

Judge James M. Moody.  Any party may serve and file written objections to this

recommendation.  Objections should be specific and should include the factual or

legal basis for the objection.  If the objection is to a factual finding, specifically

identify that finding and the evidence that supports your objection.  An original and

one copy of your objections must be received in the office of the United States

District Clerk no later than fourteen (14) days from the date of the findings and

recommendations.  The copy will be furnished to the opposing party.  Failure to file

timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new,

different, or additional evidence, and to have a hearing for this purpose before the

United States District Judge, you must, at the same time that you file your written

objections, include a "Statement of Necessity" that sets forth the following:

1.    Why the record made before the Magistrate Judge is inadequate.

2.    Why the evidence to be proffered at the requested hearing before the United States District Judge was not offered at the hearing before the Magistrate Judge.

3.    An offer of proof setting forth the details of any testimony or other evidence (including copies of any documents) desired to be introduced at the requested hearing before the United States District Judge.

From this submission, the United States District Judge will determine the necessity

for an additional evidentiary hearing, either before the Magistrate Judge or before the

District Judge.

Mail your objections and "Statement of Necessity" to:

Clerk, United States District Court
Eastern District of Arkansas
600 West Capitol Avenue, Room 149
Little Rock, AR 72201-3325

## I.  Background

Pending before the Court is a § 2254 Petition for a Writ of Habeas Corpus filed

by Petitioner, Paul Emery ("Emery").  (Docket entry #11).  In his Petition, Emery

attacks his February 20, 1997 conviction and sentence, in Jackson County Circuit

Court, for the rape and sexual abuse of his then eleven-year old daughter, Katherine Emery ("Katherine").

During Emery's trial, Katherine unequivocally testified that on one occasion her father sexually abused her and on another occasion her father raped her.[1] Katherine's testimony was supported by: (1) testimony from Charles Beall, an Arkansas State Police Investigator who interviewed Emery, and Emery's girlfriend, Melissa Dean; and (2) a medical report prepared by a nurse who examined Katherine at Arkansas Children's Hospital on September 20, 1995.

The events giving rise to Emery's habeas claims were set in motion in 2005, eight years after his trial, when a twenty-one year old Katherine wrote him a letter recanting her trial testimony. In this letter, Katherine stated that her mother pressured her to lie in order to get Emery out of her life, and that her mother "had her hypnotized," apparently to assist her recollection of the details surrounding the sexual abuse and rape.

On August 11, 2010, the Court entered an Order (docket entry #27 at 1-10) detailing the complex procedural history of Emery's attempts to obtain state and federal postconviction relief.  His efforts finally culminated in the Eighth Circuit Court of Appeals entering a Judgment on May 16, 2008 (docket entry #8) authorizing

---

[1]Katherine was thirteen-years old at the time of trial.

3

him to proceed with a second § 2254 habeas Petition on two narrow constitutional grounds: (1) his "daughter's trial testimony was perjured;" and (2) evidence of his daughter's alleged hypnosis was "concealed from the defense," which deprived him of his right to a fair trial and due process. (Docket entry #11 at 5-6).

On May 28, 2008, Emery filed his duly-authorized second § 2254 habeas Petition. (Docket entry #11). On June 17, 2008, Respondent filed a Response (docket entry #14) arguing that: (1) both of Emery's claims are barred by the one-year statute of limitations; and (2) Emery is in procedural default on both of his claims because he failed to raise them properly in state court.

In its August 11, 2010 Order, the Court held that: (1) Respondent's statute of limitations defense had no merit (docket entry #27 at 13-16); and (2) an evidentiary hearing was necessary to adequately develop the facts surrounding Respondent's argument that Emery had procedurally defaulted both claims asserted in his second § 2254 habeas Petition.[2]

---

[2]The August 11, 2010 Order goes on to explain that Emery's claim of "actual innocence" (based on Katherine's allegedly perjured trial testimony) is *not* cognizable as a substantive claim for habeas relief because this is a noncapital case. (Docket entry #27 at 17-19). However, Emery could use his "actual innocence" claim as a "gateway" to reach the merits of an otherwise procedurally defaulted *Brady* claim, that evidence of his daughter's hypnosis was concealed from the defense. (Docket entry #27 at 20-24).

4

On October 14, 2010, the Court conducted an evidentiary hearing. Emery appeared with his court-appointed counsel, Eric Gribble[3], and Respondent appeared through Arkansas Assistant Attorney General Pamela Rumpz. Counsel stipulated to the admissibility of Petitioner's Exhibits 1-8, and Respondent's Exhibits 1-17. Thus, without objection, the Court received all of those exhibits into evidence. Additionally, the Court received Respondent's Exhibits 18 and 19 into evidence over Emery's objections to their admissibility.

The Court heard testimony from: (1) Katherine Emery; (2) Paul Emery; (3) Jim Stallcup, the former Jackson County Prosecuting Attorney who prosecuted Emery; (4) Stanley Montgomery, a former deputy Jackson County Prosecuting Attorney who also prosecuted Emery; (5) Lorelie Sellers, a former case manager with the Arkansas Department of Human Services/Division of Children and Family Services ("DHS/DCFS") who investigated Katherine's complaint of rape and sexual abuse; (6) Katrina Calhoun, the victim's mother; and (7) Jackson County Sheriff David Lucas, who was then an investigator in the Jackson County Sheriff's Office and was responsible for the criminal investigation.

---

[3]On August 13, 2010, the Court appointed Mr. Gribble to represent Emery. (Docket entry #29). In conducting discovery for the evidentiary hearing, Mr. Gribble left no stone unturned and did an excellent job representing Emery. The Court appreciates Mr. Gribble accepting this appointment.

Additionally, counsel for the parties stipulated that: (1) the Jackson County Prosecuting Attorney's Office could *not* locate the file used to prosecute Emery; (2) DHS could *not* locate the file concerning its investigation of Katherine's sexual abuse and rape; and (3) Val Price, Emery's trial attorney, no longer had his file and had no recollection of Emery's case.

## II.  Discussion

### A.  Emery's Gateway Actual Innocence Claim That His Daughter's Trial Testimony Was Perjured

#### 1.  Standard of Review Governing Emery's Burden of Establishing a Gateway Actual Innocence Claim

A habeas petitioner may obtain review of a procedurally defaulted claim "if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (ellipsis in original) (*quoting McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).  "*Schlup* allows a petitioner to raise a gateway claim of actual innocence, that, if established, will allow him to present otherwise procedurally defaulted claims to the federal habeas court."  *Nance v. Norris*, 392 F.3d 284, 291 (8th Cir. 2004) (internal citation and quotation omitted).

In *Schlup*, the Court held that to satisfy the "fundamental miscarriage of justice" standard, in the context of a habeas petitioner raising a claim of actual innocence to avoid a procedural bar, "the petitioner must show that it is more likely

6

than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327.

In *House v. Bell*, 547 U.S. 518, 538 (2006), the Court elaborated on how a habeas court is to weigh evidence presented in support of a *Schlup* claim:

> *Schlup* makes plain that the habeas court must consider "'all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See id.*, at 327-328, (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L.Rev. 142, 160 (1970)). Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." 513 U.S., at 329. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors. *Ibid.*
>
> * * *
>
> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt-or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.
>
> * * *
>
> Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. *See ibid.* If new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial." *Ibid.*; *see also ibid.* (noting that "[i]n such a case, the habeas court may have to make some credibility assessments").

7

*House*, 547 U.S. at 537-39. *See also Doe v. Menefee*, 391 F.3d 147, 173 (2nd Cir. 2004) ("Even if the court, as one reasonable factfinder, would vote to acquit, the court must step back and consider whether the petitioner's evidentiary showing most likely places a finding of guilt beyond a reasonable doubt outside of the range of potential conclusions that *any* reasonable juror would reach. *See Schlup*, 513 U.S. at 333, 115 S.Ct. 851 (O'CONNOR, J., concurring). If the court finds that even one juror might reasonably vote to convict, the court must find that the petitioner has failed to establish his actual innocence.") (Emphasis in original).

### 2.    Evidence Produced Against Emery At Trial

Emery voluntarily agreed to a polygraph test administered by Arkansas State Police investigator Charles Beall.[4] Beall testified that he asked Emery whether he had

---

[4]Emery's trial attorney, Val Price, advised Emery *not* to take the polygraph test. (Docket entry #45, Ex. 20A; Trial Tr. 22). Against the advice of his attorney, Emery took the polygraph test. The trial court properly refused to admit any testimony about the polygraph test or its results. (Docket entry #45, Ex. 20A; Trial Tr. 23).

During the evidentiary hearing, Respondent sought to introduce the results of the polygraph test as Respondent's Exhibit 19. Emery objected and argued that the Court should not admit or consider the results of the polygraph test in deciding his habeas claims.

Because the Court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial," it held that the polygraph results were admissible in the habeas proceeding. *See House, supra*, 547 U.S. at 537 (internal quotations omitted). However, the Court made it clear that those results were entitled to little, if any, weight. In ruling on the merits of Emery's habeas claims, the

8

sex with his daughter.  (Docket entry #45, Ex. 20A, Trial Tr. 67).  According to Beall, Emery gave two answers to this question: (1) "I don't remember if I did or not.  I was using drugs at the time;" and (2) there was a "fifty percent chance that I did."[5]  *Id.*

Emery's girlfriend at the time, Melissa Dean ("Dean"), testified that, in 1995, she lived with Emery for five or six months in his home in Diaz.  (Docket entry #45, Ex. 20A; Trial Tr. 68-69).  During that time, Dean heard Emery say "nasty things around [Katherine] and tell her that she had a nice looking butt and, talk about her boobs . . . [j]ust the kind of things you don't say to a daughter."  (Docket entry #45, Ex. 20A; Trial Tr. 69).  She also heard him tell his daughter that "she was starting to get [her breasts] and that they were starting to look good."  (Docket entry #45, Ex. 20A; Trial Tr. 70).  Most nights, when Katherine stayed with Emery, she slept between Dean and Emery in the same bed.  (Docket entry #45, Ex. 20A; Trial Tr. 70-71).

Katherine testified that she was raised by her mother, Katrina, and her stepfather, in Diaz.  (Docket entry #45, Ex. 20A; Trial Tr. 80).  When Katherine was a young child, Emery left town and she did not see him again until 1995, when he

_____

Court has now decided to give those results *no weight*.

[5]Consistent with the trial court's earlier ruling, Beall made no mention of the fact that Emery gave these answers during a polygraph examination.

returned to Diaz and moved into a house close to where she lived with her mother.

As an eleven-year old, who had limited previous contact with her father, Katherine was interested in getting to know Emery.  During the summer of 1995, she often went to Emery's house and spent the night.  (Docket entry #45, Ex. 20A; Trial Tr. 80-81).  She slept in a queen-size bed with Emery and Dean.  *Id.*

One night in June of 1995, while Katherine was in bed with Emery and Dean, he put his finger in Katherine's vagina.  (Docket entry #45, Ex. 20A; Trial Tr. 82).  He told her not to tell anyone or he would kill her or her mother. (Docket entry #45, Ex. 20A; Trial Tr. 83).  Emery also touched Katherine's stomach and breasts.  *Id.* Dean was asleep at the time.  (Docket entry #45, Ex. 20A; Trial Tr. 82).

 Katherine also testified that, some time after this initial incident, she was at Emery's house, in the afternoon or evening, asleep in the bed.  She awakened with Emery on top of her.  (Docket entry #45, Ex. 20A; Trial Tr. 84-85).  He reached under the bed, got a condom, put it on, and then inserted his penis inside of her. *Id.* Emery told Katherine not to tell anyone, and said that, if she told anyone, he would kill her mother. (Docket entry #45, Ex. 20A; Trial Tr. 86).

Some time in August, Emery married a woman named Christina Lowery and moved to California.  (Docket entry #45, Ex. 20A; Trial Tr. 89).  On cross-examination, Katherine admitted that she did not mention the two incidents with

Emery to her mother until some time after he had moved to California.  (Docket entry #45, Ex. 20A; Trial Tr. 88).

In September of 1995, Katherine met with state police investigator David Lucas and told him about Emery "sticking his finger insider of her."  She testified that she lied when she told Lucas that  nothing else had happened between her and her father.  (Docket entry #45, Ex. 20A at 46; Trial Tr. 88).  Katherine also admitted that she lied to Emery's brother, Billy Emery, when she told him that "none of this happened."  (Docket entry #45, Ex. 20A at 53-54; Trial Tr. 95-96).  According to Katherine, she lied to Billy Emery because he was known to be violent and she feared him.  (Docket entry #45, Ex. 20A at 57; Trial Tr. 99).

On September 20, 1995, a Registered Nurse Practitioner ("RNP") at Arkansas Children's Hospital examined Katherine for signs of rape and child abuse. The RNP diagnosed "suspected sexual abuse" based on "the appearance of angulation of the hymen at 6:00 o'clock in supine position; area of erythema on body of hymen at 6:00 o'clock" and "excessive exposure of vaginal contents."[6]  (Docket entry #45, Ex. 20A; Trial Tr. 103-05, 141-48).  The RNP who performed the examination did *not* testify

---

[6]Much of the language used by the RNP to support her diagnosis is ambiguous. Not surprisingly, the jury sent the judge a note requesting an explanation of the meaning of this language. (Docket entry #45, Ex. 20A; Trial Tr. 128: "May we have a medical interpretation of the medical report?").  The judge denied the request. *Id.*

at trial.  Thus, the only evidence of the results of the examination was the medical

record prepared by the RNP. (Docket entry #45, Ex. 20A; Trial Tr. 141-48).  This

document was admitted into evidence, without objection, as an "agreed exhibit."

(Docket entry #45, Ex. 20A; Trial Tr. 104).

The only defense witness called was Lisa Elliott, Emery's sister.  She testified

that, in August of 1995, she asked Katherine: "Did your daddy rape you?" According

to Elliott, Katherine  answered "no."  (Docket entry #45, Ex. 20A; Trial Tr. 108-09).

Elliott testified that she then asked Katherine "Well, why did you say it?" Katherine

answered that "her momma made her."

### 3.   Evidence Presented During the October 14, 2010 Evidentiary Hearing

#### (a).   Katherine's Testimony

Katherine testified that, after her father's trial, she had no contact with him

until eight years later, in March of 2005.  Emery often wrote Katherine's cousin,

Bobbie Emery, and Bobbie told Katherine that Emery badly wanted to see her.  This

led Katherine to visit her father in prison in March, 2005.  Katherine testified that she

hoped, during one of her visits, her father would explain why he had raped and

sexually abused her and apologize for his actions.

According to Arkansas Department of Correction log books, Katherine visited

Emery on April 3, 2005.  Respondent's Exhibit 16.  The visit lasted approximately

four hours.  *Id.*  During the April 3, 2005 visit, Katherine testified that Emery

threatened to kill her and her mother if Katherine did not write a letter recanting all

of her trial testimony and affirmatively stating that Emery had not sexually abused or

raped her.  Katherine testified that she was still scared of Emery's brothers, Billy and

Kenny Emery, whom she thought were capable of carrying out Emery's threat to kill

her and her mother.  Katherine stated that Emery later wrote her a letter instructing

her what to say in her recantation, and reminding her to have it notarized.

On April 6, 2005, Katherine wrote Emery an eleven-page handwritten letter.

Katherine signed the letter under oath and her signature was notarized.[7]  In her letter,

Katherine states that her mother pressured her to make up the rape and sexual abuse

allegations against Emery to get him out of Katherine's life.  (Docket entry #11 at 16-

26).[8]  In one portion of the letter, Katherine described how her mother "even took

[me] and had me hypnotized":

> [Mother] had to figure out a way to get you back out of my life.  So after
> you left for California, and it was like the day after too [Mother] started

---

[7]The first page of the letter is dated April 6, 2005.  However, the notarized
signature is dated April 7, 2005.  Katherine was twenty-one years old when she wrote
this letter.

[8]Katherine's letter was introduced at the October 14, 2010 evidentiary hearing
as Petitioner's Exhibit 1.

saying things to me like I know he done something to you, what did he do?  I had to sit down at that table for like 2 hours and listen to her hound things in to my head about you.  I just would cry at night b/c I didn't know what to do about her.  She even took and had me hypnotized.  After about almost the 3rd week listening to all that bullcrap she was saying to me and her trying to pump just anything out of me.  I didn't know what else to do besides make up something to tell her just so she would leave me alone.  Which after she heard what she wanted to hear and went to the police and I had to tell them.  I knew if I didn't tell them she would just punish me for it.  I am sorry daddy for what I have put you through.  I just didn't know what else to do.

(Docket entry #11 at 19-20).

During the evidentiary hearing, Katherine admitted that she wrote the April 6, 2005 letter and had it notarized.  However, she unequivocally testified that the letter was "all a lie," and that she wrote what Emery "wanted to hear."  Katherine denied that her mother pressured or forced her to make up any allegations against her father.  She reaffirmed the truthfulness of her trial testimony and made it clear she wrote the recantation letter only because Emery threatened to kill her and her mother unless she did so.

After writing the letter, Katherine continued to make regular visits to see Emery in prison, often with one or both of her children.  During these visits, Katherine typically would stay the maximum four hours allowed by the ADC.  She also regularly visited Emery on holidays.  ADC records reflects fourteen visits in 2005, five visits in 2006, two visits in 2007, and four visits in 2008.  Her sole visit

14

to see Emery in 2009 was on January 4, which marked the last time she saw Emery prior to the October 14, 2010 evidentiary hearing.[9]

Katherine also admitted that she wrote her father numerous letters after writing the April 6, 2005 recantation letter.[10]  On September 6, 2005, she wrote Emery telling him about seeing her son.[11]  On November 24, 2008, she wrote Emery telling him that she was "ready for him to come home and help out with the kids."[12]  This letter also states "Mom's real bad," which Katherine explained was a reference to her mother's poor health.  In an undated letter, she told Emery that she was going to buy him some clothes for Christmas and for when he comes home.[13]

Katherine admitted that she never told anyone about Emery's threat to kill her and her mother unless she wrote the April 6, 2005 recantation letter.  She also admitted that the first time she told anyone that the April 6, 2005 letter was a lie was during a September 7, 2010 interview with Bernie Mosley, an investigator with the Arkansas Attorney General's Office.

---

[9]Petitioner's Exhibits 2 and 3.

[10]At some point in 2008, Emery returned to Katherine all of the letters that she had written to him in prison, except the recantation letter, and she later burned them.

[11]Petitioner's Exhibit 8.

[12]Petitioner's Exhibit 6.

[13]Petitioner's Exhibit 7.

With respect to the assertion in the April 6, 2005 letter that her mother had her hypnotized, Katherine recalled being hypnotized, when she was seven-years old, to help her overcome sleeping problems.  She made it clear her hypnosis had nothing to do with the criminal charges that were filed against Emery *four years later* for raping and sexually abusing her.  She testified that her sleeping problems were "okay" by the time she was eight-years old, and that neither before, during, or after Emery's trial did she ever tell anyone about being hypnotized four years earlier.

Katherine stated that she still loves her father.  However, during her last visit to see him, on January 4, 2009, he asked her to testify at his upcoming parole hearing and reaffirm the truthfulness of her April 6, 2005 recantation letter.  That caused her to realize that Emery was never going to accept responsibility for what he had done to her or apologize for his actions.  She decided to never visit him again.

### (b).   Emery's Testimony

Emery testified that he did not do anything to seek Katherine out in 2005, and that she came to see him in prison on her own accord.  He denied threatening her or asking her to write the April 6, 2005 recantation letter.  According to Emery, he never called or wrote Katherine to tell her what to put in the April 6, 2005 letter.  Instead, Katherine mailed the April 6, 2005 letter to him of her own volition after their April 3, 2005 visit.

Emery testified that neither he nor his trial attorney, Val Price, had any knowledge of Katherine's hypnosis prior to trial, or of her mother influencing Katherine's allegations and testimony.  According to Emery, after Katherine began visiting him, she would tell him she was sorry for lying at his trial and that her mother made her do it.  Emery denied asking Katherine to recant her trial testimony at his parole hearing and testify that her mother made her do it.[14]  According to Emery, every time that she visited him, Katherine apologized for lying at his trial.

Finally, Emery testified that he moved to Diaz in August of 1994 and renewed a sexual relationship with Katrina, Katherine's mother.  At that time, Katrina was married to someone named Henderson.[15]  Emery moved into a house three doors down from Katrina.  Their sexual relationship ended in December of 1994, when Emery began dating and living with Dean.  Some time in the summer of 1995, Emery began a relationship with Christina Lowery, who was Katrina's niece, and

---

[14]Emery acknowledged that he must successfully complete the ADC Reduction of Sexual Victimization Program ("RSVP")  for sex offenders *before* he can become eligible for parole.  He also acknowledged that he would have to admit responsibility for his crimes in order to gain entrance into the RSVP program, something he testified he would not do. Although he applied for the RSVP program, he was denied entry due to his ongoing "court case [this habeas action]" in which he continues to profess his innocence.

[15]Katrina testified that Emery was Katherine's biological father, but they never married.

Katherine's first cousin.[16]  Lowery was living with Katrina at the time she began to date Emery.  According to Emery, Katrina became angry when she learned of Lowery's relationship with him, and kicked Lowery out of her house.  Lowery then moved in with Emery.  They married in August of 1995, and then moved to California.[17]

### (c).    Jim Stallcup's Testimony

From 1979 to 1999, Jim Stallcup was the Prosecuting Attorney for the Third Judicial District, including Jackson County.  Stallcup prosecuted the case against Emery but had no recollection of the case, and did not recognize Emery during the evidentiary hearing.  He could not recall having any information that Katherine was hypnotized or pressured by anyone to testify against Emery.  Stallcup indicated that

---

[16]There is nothing in the record regarding Lowery's age when she began to date Emery.  During Emery's trial, Katherine testified that, in the summer of 1995, when she was eleven-years old, she accompanied Emery and Lowery to Emery's house where she watched them have sex.  (Docket entry #45, Ex. 20A; Trial Tr. 94-95).

[17]On August 25, 1995, Emery wrote to Katherine telling her that he was sorry that he left Diaz for California without letting her know.  Emery wrote that he loved her, but that if he "was to stay there I would [end] up in jail or dead or in trouble all the time."  Respondent's Exhibit 18.  Emery denied that his reference to ending up in jail, if he stayed, had anything to do with his having raped and sexually abused Katherine.

In September of 1995, Katherine revealed to her grandmother that Emery had raped and sexually abused her.  Katrina immediately called the Jackson County Sheriff's Office and reported the crime.  The resulting criminal investigation led to Emery being charged with raping and sexually abusing Katherine.

he believed he would have remembered if he had been told that Katherine had been hypnotized because it would have been so unusual.  He also acknowledged that, if he had been advised that Katherine had been hypnotized to aid her recollection of what Emery did to her, he would have been required to disclose that information to Val Price, Emery's trial attorney.

Stallcup testified that, while he was the prosecutor, it was his policy to retain all criminal files indefinitely.  They would typically be maintained by the deputy prosecutor assigned to the case.  Finally, Stallcup could not recall having any of his convictions reversed due to his office's failure to disclose potentially exculpatory *Brady* information.

### (d).   Stanley Montgomery's Testimony

Stanley Montgomery was the deputy prosecuting attorney for Jackson County from 1986 to 2002.  He assisted Stallcup in prosecuting the State's case against Emery.

During the evidentiary hearing, Montgomery recognized Emery, but had no recollection of his case.  He did not recall Katherine being hypnotized, but believed he would have remembered it if that information had been conveyed to him. Montgomery had no recollection of Katherine's mother pressuring her to testify.  He would have considered information that a witness was hypnotized or pressured to

testify as material covered by *Brady* and he would have disclosed that information to the defense.

Montgomery was not surprised that a criminal file could be lost after thirteen years. He could not recall one of his criminal convictions being overturned for a *Brady* violation.

### (e).   Lorelie Sellers' Testimony

Lorelie Sellers worked as a case manager for DHS/DCFS from 1990 to 1996. She was responsible for the protective services case involving Emery's rape and sexual abuse of Katherine. Prior to Emery's trial, she interviewed Katherine once about what happened to her.[18]

Sellers was not surprised that Katherine's DHS file could not be located. Although it was DHS policy to retain files for substantiated investigations "forever," it was not uncommon for files to be lost. She knew nothing about Katherine being hypnotized prior to Emery's trial, or being pressured to testify against Emery. She could not recall ever interviewing a victim who had been hypnotized to assist her recollection. During her interview with Katherine, in October of 1995, Sellers testified that Katherine told her that Emery had raped and sexually abused her.

---

[18]Lorelie Sellers did not testify during Emery's trial.

### (f).   Katrina's Testimony

Katherine's mother, who now goes by the name of Katrina Calhoun, lived in Diaz from 1995 to 1996.  Katrina testified that, in September of 1995, Katherine came to her and "Nanny" (Katrina's mother) at the kitchen table and told them that she had been sexually abused by Emery.  Katrina and Katherine went to Jackson County Sheriff's Investigator David Lucas, although she could not recall if she was present for Lucas's interview with Katherine.

Katrina testified that she had no recollection of Katherine ever being hypnotized.  When Katherine was seven or eight, she had mental health counseling for a sleep disorder, but she did not recall hypnosis being part of the treatment Katherine received.  According to Katrina, she never: (1) pressured Katherine to testify against Emery; (2) made Katherine make up any facts about what Emery did to her; or (3) threatened Katherine with punishment if she did not testify against Emery.

Katrina stated that Katherine moved out of her house when she was sixteen or seventeen years old.  Katrina said she had a good relationship with Katherine and that Katherine was not afraid of her.

Katrina denied having a sexual relationship with Emery when he returned to Arkansas in 1994 and 1995.  According to Katrina, she was not mad about Christina

Lowery dating Emery, but kicked her out of the house because she would not get a job. Her health started declining about five years ago, after she suffered a stroke.

### (g).   David Lucas's Testimony

Sheriff David Lucas began working for the Jackson County Sheriff's Office in 1993, and was elected Sheriff in 2004.  On August 31, 1995, Katrina came to him and complained that Katherine had been sexually abused.  On September 1, 1995, he interviewed Katherine, who appeared to be truthful.  In this interview, Katherine stated that Emery fondled her and digitally penetrated her.  She did *not* tell Lucas that Emery also used his penis to have sex with her.  Katrina was present at the beginning of this interview but then stepped out.

On October 19, 2005, Sheriff Lucas and Lorelie Sellers together interviewed Katherine.  In this interview, Katherine stated that her father raped her with his penis.

After criminal charges were filed against Emery, Sheriff Lucas could not locate him in Arkansas.  He later traced Emery to California, where he was arrested.  He had no evidence in his investigative file that Katherine was hypnotized or pressured by her mother to testify.  He only recalled one case involving a rape victim who was hypnotized, and that information was disclosed to defense counsel.

### 4.   Analysis of Emery's Gateway Actual Innocence Claim

As indicated earlier, the Court must make a "probabilistic determination,"

based on the total record, including the old and new evidence, as to whether it is "more likely than not, in light of the new evidence, no reasonable juror would find [Emery] guilty beyond a reasonable doubt." *See House*, 547 U.S. at 537.

Emery argues that Katherine's testimony at the October 14, 2010 evidentiary hearing was not credible. He emphasizes the detailed nature of Katherine's April 6, 2005 recantation letter, which she wrote as a twenty-one year old adult. He contends that Katherine's explanation that the April 6, 2005 letter was written in response to a threat from him is belied by Katherine's numerous later visits to him in prison (often accompanied by her children) and her continued expressions of love for him in her subsequent letters.

Katherine's trial testimony was pivotal to Emery's conviction. Without her testimony, it is doubtful that the remaining evidence would have been legally sufficient to convict him. However, the trial record clearly contained *other evidence* which strongly bolstered Katherine's trial testimony: (1) Emery's statement to State Trooper Beall that: "I don't remember if I did [rape Katherine] or not. I was using drugs at the time;"and there was a "fifty percent chance that I did"; (2) Dean's testimony that, as an eleven-year old, Katherine regularly slept in a queen-size bed between her and Emery; (3) Dean's testimony that Emery regularly made "nasty" comments about his daughter's body that a "father wouldn't say to a daughter;" and

23

(4) the September 20, 1995 medical report indicating "suspected sexual abuse." Obviously, the jury chose to credit Katherine's trial testimony, and the other supporting evidence of Emery's guilt.

During the evidentiary hearing, Katherine offered *credible testimony* explaining that her April 6, 2005 recantation letter was a *complete lie* and that she wrote the letter only because Emery threatened to have her and her mother killed if she did not do so. Katherine also reaffirmed the truthfulness of her trial testimony, given in 1997, when she was thirteen-years old.

Finally, even *if* Katherine had stood by the truthfulness of her April 6, 2005 letter, the Court would be required to view her recantation testimony with considerable suspicion because "[t]he stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial." *See United States v. Rouse*, 410 F.3d 1005, 1009 (8th Cir. 2005) (*quoting United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir.1997)). Skepticism about the truthfulness of such testimony is particularly warranted in familial sexual abuse cases. In *United States v. Provost*, 969 F.2d 617, 621 (8th Cir.1992) the Court surveyed a number of sources documenting the recurring phenomena of children later recanting their trial testimony in child sexual abuse cases:

As the district court observed, the skepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon. *See, e.g., Myatt v. Hannigan*, 910 F.2d 680, 685 n. 2 (10th Cir.1990) (noting that child recanting in sexual abuse case not atypical); State v. Cain, 427 N.W.2d 5, 8 (Minn. Ct.App. 1988) (noting recantation is "frequent characteristic of child abuse victims"); *State v. Gallagher*, 150 Vt. 341, 350, 554 A.2d 221, 225 (1988) ("observing the high probability of a child victim recanting a statement about being sexually abused"); *see also* Summit, *Child Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177, 188 (1973) ("whatever a child says about sexual abuse, she is likely to reverse it."). Recantation is particularly common when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story. *See State v. Tharp*, 372 N.W.2d 280, 282 (Iowa Ct.App.1985) (upholding denial of new trial request based on 14 year old victim's recantation and noting that "where families are torn apart, there is great pressure on the child to make things right."); Cacciola, *The Admissibility of Expert Testimony in Intrafamily Child Sexual Abuse Cases*, 34 U.C.L.A. L.Rev. 175, 184-88 (1986) (noting susceptibility of child victim to family pressure and to recant the testimony to return things to "normal"). The Ninth Circuit very recently affirmed a district court's finding that a recantation by a child sex abuse victim was not credible and, therefore, was insufficient to support a Rule 33 new trial motion where the victim was subject to the influence of members of her immediate family including her mother. *United States v. George*, 960 F.2d 97, 101 (9th Cir.1992).

*Provost*, 969 F.2d at 620-21 (affirming denial of motion for new trial).  *See also Artiaga v. Money*, 2006 WL 196612 (N.D. Ohio July 11, 2006) (unpublished decision) (citing cases and treatises); *Gonzalez v. Martinez*, 2010 WL 3522962 (D. Or. Aug. 12, 2010) (rejecting *Schlup* actual innocence claim of a habeas petitioner convicted of the sexual abuse of his children, who later presented letters from victims

recanting their prior accusations of abuse); *Dahn v. Reddish*, 2009 WL 902059 (M.D. Ga. Mar. 31, 2009), *vacated on other grounds*, 2010 WL 2341242 (11th Cir. June 11, 2010) (unpublished decision) (child rape victim who recanted her testimony in an affidavit, but then reversed her recantation in a deposition given as part of the habeas proceeding, did not establish *Schlup* actual innocence); *Settles v. Brooks*, 2008 WL 2988123 (W.D. Pa. July 31, 2008) (child sexual abuse victim's notarized statement recanting her trial testimony was not "new" evidence because the fact of the victim's alleged recantation was available at time of trial and, alternatively, was not sufficient to satisfy the petitioner's burden under *Schlup*).

The Court simply cannot find that no reasonable juror (after considering all of the evidence contained in the February 20, 1997 trial record, the April 6, 2005 recantation letter, and all of the evidence introduced during the October 14, 2010 evidentiary hearing) would not have voted to convict Emery. Similarly, a reasonable juror clearly could have concluded that Katherine's testimony at the 1997 trial and at the 2010 evidentiary hearing was credible, and reject the April 6, 2005 recantation letter. In other words, to restate this proposition in the affirmative, a reasonable juror, *considering all of the evidence, old and new*, still could have convicted Emery of the rape and sexual abuse of Katherine. Thus, Emery has failed to meet the burden required to pass through the *Schlup* actual innocence gateway.

**B.    Emery's *Brady* Claim That Evidence of His Daughter's Hypnosis Was Concealed From the Defense**

Because the Court has concluded that Emery has not satisfied his burden under *Schlup*, there is no need to address the merits of his procedurally defaulted *Brady* claim.  However, even assuming that Emery could pass through the *Schlup* gateway, his *Brady* claim lacks merit.

"Under *Brady*, the defendant must establish that: (1) the evidence at issue is material and favorable to the defendant; (2) the evidence was suppressed by the government; and (3) the defendant was prejudiced by the suppression in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *United States v. Parker*, 267 F.3d 839, 846 (8th Cir. 2001) (internal quotation omitted).  Emery's burden is further compounded and made more onerous because he now presents his *Brady* claim in a successive habeas Petition.  As explained in the Court's August 11, 2010 Order (docket entry #27 at 10-12), a successive habeas petitioner must establish that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2244(b)(2)(B)(ii).

In the April 6, 2005 recantation letter, Katherine makes a single vague reference to her mother having taken her "and had me hypnotized."  During the evidentiary hearing, Katherine made it clear that she was hypnotized when she was seven-years old to help her overcome problems with her sleep.  This hypnosis had nothing to do with the criminal investigation four years later into whether Emery had raped and sexually abused Katherine.  Finally, even if Katherine had been hypnotized to assist her recollection of what Emery did to her, *all* of the investigators and prosecutors testified that they had no recollection of it and thought they would have recalled it and disclosed it to the defense if it had come to their attention.

Emery asks the Court to draw an adverse inference in support of his *Brady* claim based on the missing prosecution and DHS files.  In his Post-Hearing Brief (docket entry #46), Emery relies on cases from other jurisdictions to argue that the Court may draw an adverse inference, without evidence that the files were intentionally destroyed.  He also cites *Koons v. Aventis Pharm., Inc.*, 367 F.3d 768, 780 (8th Cir. 2004), where the Court noted that the loss of documents in violation of a document retention policy can be "some evidence" of bad faith.  Emery contends that the loss of the prosecution and DHS files, in contravention of the policy to retain those files forever, should "rise to a level of bad faith" because of the particular importance of persevering evidence in criminal cases which involve a person's

constitutional rights.

The Court rejects Emery's argument.  Based on the record developed in this case, there is nothing to warrant drawing an adverse inference from the missing files. There is *no evidence* that anyone acted in bad faith or with the intent to destroy any of the missing files in this case.  *See Langford v. Norris*, 614 F.3d 445, 462 (8th Cir. 2010) (the adverse inference rule "provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him") (*quoting Int'l Union, UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir.1972)).  Where a witness fails to produce evidence within his control, an adverse inference "is open always to explanation by circumstances which make some other hypothesis a more natural one than the party's fear of exposure." *Langford*, 614 F.3d at 462 n.8.  *Cf. Menz v. New Holland North America*, 440 F.3d 1002, 1006 (8th Cir. 2006) (adverse inference instruction requires a finding of bad faith); *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 811 (8th Cir. 2005) (party seeking adverse inference must show that "once-extant records were destroyed 'to suppress the truth,' and that the records would have favored its case").  Accordingly, the Court concludes that Emery's *Brady* claim is without merit.

### III.  Conclusion

IT IS THEREFORE RECOMMENDED THAT the Petition for a Writ of

Habeas Corpus (docket entry #11) be DENIED, and the case DISMISSED, WITH

PREJUDICE.   IT IS FURTHER RECOMMENDED THAT a Certificate of

Appealability be DENIED pursuant to Rule 11(a) of the Rules Governing Section

2254 Cases.

Dated this 30th day of November, 2010.

_____
UNITED STATES MAGISTRATE JUDGE